NAPOLEON EUSTATHOPOULO and Another, Respondents, v. WILLIAM GILLESPIE and Others, Trading under the Firm Name of GIL-LESPIE BROTHERS, Appellants.

First Department, November 5, 1926.

Sales — action by purchaser for breach of alleged contract of sale of flour for foreign shipment — letters and cablegrams considered and held not to show meeting of minds of parties — no contract of sale established.

In an action by a purchaser to recover damages for the breach of an alleged contract of sale of flour for foreign shipment, the contract being based entirely upon correspondence and cablegrams, the plaintiff failed to make out a case showing the execution of a valid contract of sale, since an examination of the correspondence and cablegrams shows that there never was a meeting of the minds of the parties.

APPEAL by the defendants, William Gillespie and others, from a judgment of the Supreme Court in favor of the plaintiffs, entered in the office of the clerk of the county of New York on the 12th day of June, 1925, upon the decision of the court rendered after a trial before the court without a jury.

The court found that a valid contract had been made by the interchange of letters and cables, that defendants breached the contract to plaintiffs' damage in the sum of $3,522.70, and directed a verdict for plaintiffs in that amount.

*R. Randolph Hicks* of counsel [*George F. Canfield* and *Thomas F. Compton* with him on the brief; *Satterlee & Canfield,* attorneys], for the appellants.

*John D. Stephanidis* of counsel [*Maurice R. Cheyette* with him on the brief], for the respondents.

BURR, J. This action is to recover damages for breach of contract.

The complaint alleges that between the 25th day of November

and the 10th day of December, 1914, a contract was made and entered into between the parties whereby plaintiffs agreed to purchase and defendants agreed to sell plaintiffs 3,000 bags of flour at the price of 36.35 francs per bag c.i.f. Salonica for prompt delivery, and alleges further the breach by defendants in failing to ship pursuant thereto.

The answer denies the material allegations as to the existence of a contract and admits non-delivery. The alleged contract is based on letters and cables which passed between the parties during the period mentioned in the complaint. The correspondence in evidence is voluminous. It may, however, be divided into the letters and cables which are claimed by plaintiffs to have created the contract sued on and those letters and cables sent by defendants to the plaintiffs after the making of the alleged contract which it is claimed by plaintiffs on this appeal " clearly evince defendants' understanding of the existence of a contract."

Plaintiffs are commission merchants and importers in Salonica, Greece, and defendants are export and commission brokers in New York.

The correspondence begins on September 7, 1914. On that date the plaintiffs wrote defendants as follows:

" We owe your valued address as exporters of flour to the ' American Exporter ' and we hereby beg to inform you that we are in a position to place about 100,000 bags of flour — bags of 100 kilos each — at a price varying from frs. 30 to maximum frs. 35 per 100 ko. c.i.f. Salonica in transit.

" In case you are interested in this business we would suggest that you send us by return mail a few samples of flour at prices mentioned above and we will, at once see to submit you our first trial order.

" Re shipment, we would ask immediate shipment as the demand is very urgent. Should you not be able to ship above quantity by one steamer please inform us, which is the biggest quantity you can supply. We pay by first class bankers credit in London.

" Awaiting your urgent reply."

To this letter defendants replied under date of September 30, 1914, as follows:

" We have your esteemed favor of the 7th and under separate cover are sending you a sample of our best bakers flour brand ' Buttress.' Today's price for this we figure 33 frs. per 100 Kilos c.i.f. Salonique.

" It would be quite impossible to get any such quantity as you specify at a few days notice. We would not like to contract for this quantity unless we had thirty (30) days time to effect shipment.

We could undoubtedly put the entire quantity on one steamer by chartering a boat, but the regular lines could not take care of it.

" Our terms would be for such large business as you specify, cash in New York against shipping documents and it would be necessary that the bank here should actually place the order with us and confirm that same would be paid to us as soon as the goods reached New York.

" We thank you for your references whom we are addressing to-day."

On November 25, 1914, plaintiffs cabled the defendants: " One thousand bags Buttress thirty-three three per cent commission National Bank of Salonica will warrant payment by cable."

In reply to this cable of November 25, 1914, defendants wrote plaintiffs as follows under date of November 28, 1914: " We received your cable as per enclosed copy and immediately tried to cable you in return that our lowest price is now Fcs. 36, 35, owing to the increase in freight rates. From enclosed cables you will see that it is impossible to send any message to your country at the present moment and we are, therefore, obliged to give you this price by mail, awaiting your confirmation by cable."

On November 29, 1914, plaintiffs again cabled defendants simply one word " Offer." This may be regarded either as a request to quote prices generally, including a price for the total quantity up to 100,000 bags mentioned in the plaintiffs' letter of September 7, 1914, or for the 1,000 bags mentioned in the plaintiffs' cablegram of November 25, 1914. There is no reference to any specific quantity.

In reply to this cable the defendants on November 30, 1914, wrote plaintiffs as follows:

" We herewith beg to confirm receipt of your cablegram reading: ' OFFER.'

" Under date of November 28th we informed you that the cable companies refused to accept the message we intended to send you. Today, however, we succeeded in sending our cablegram off and hope same was duly received by you."

And on the same day, November 30, 1914, defendants cabled plaintiffs: " Lowest 36.35 including commission payment necessary here against documents."

No reference is made in this cable to any specific quantity.

The next day, December 1, 1914, plaintiffs cabled back: " We accept 1000 quick probability 1000 more urgent." This cable it is apparent is not limited to 1,000 bags and the word " accept " cannot be said to mean the acceptance of an offer of " 1000 bags quick " as no such offer had been made.

On December 2, 1914, defendants cabled plaintiffs: "Which bank of New York have you authorized to accept your draft."

Plaintiffs cabled defendants December 3, 1914: "We have sold another thousand Salonique thousand Cavalla we credit Hanover Bank probability three thousand thirty-six."

On December 3, 1914, defendants wrote plaintiffs as follows:

"We herewith beg to enclose copy of your cablegram in which you confirm the price offered to you, but were obliged to cable you again for information with regard to the Bank here in New York through which you intend to make payment.

"We regret to say that up to the present time we have not heard from you and should be pleased to receive a reply at an early date."

On December 7, 1914, plaintiffs sent defendants two cables, one reading, "Offer five thousand." And the other reading, "We credit two thousand Salonique Cavalla offer last price five thousand December."

On December 10, 1914, defendants cabled plaintiffs: "We cannot get freight Greek Line we work with other merchants shippers to charter we shall cable as soon as possible."

And on December 10, 1914, plaintiffs wrote defendants as follows:

"We beg to own receipt of your valued favor of the 30th Sept. and thank you for your sample 'Buttress.'

"We passed you a trial order for: 1000 bags at frs. 33 per 100 kilos c.i.f. Salonica prompt shipment and received your counter offer at fcs. 36.35 c.i.f. including our commission of 3% payment against documents in N. Y.

"We accepted above order for 1000 bags and instructed the Banque d'Orient here to pay you through the Hanover National Bank, New York, the equivalent of 1,000 bags at 36.35 against your documents.

"We further sold: 1000 bags c.i.f. Salonica and 1000 bags c.i.f. Cavalla same conditions as above and hastened to cable you as per enclosed copies; we opened credit with the Irving National Bank, which certainly confirmed the credit meanwhile.

"We wired you that we sell about 5,000 bags shipment December at fcs. 36 and are sorry that you have not given us a firm offer to work. We are going to cable you again today to submit us a firm offer for 5,000 bags.

"We are in a position to sell about 20,000 bags within December, January, February and are anxious to get your offers regularly. Your sample 'Buttress' is exhausted; please send us fresh samples also of any other qualities you have on the market.

" Awaiting your good news and trusting to do a considerable business with you in future, we are, Dear Sirs, Very truly yours."

On December 10, 1914, defendants wrote plaintiffs:

" We herewith beg to confirm your telegram which we received on the 4th inst., reading as follows: ' Vendimes encore mille Salonique Mille Cavalla accreditions Hannover Bank probabilite troismille Trentesix ', which is translated ' We sold another 1000 Salonique 1,000 Cavalla, Will credit Hanover Bank, Probability 3,000 — 36.'

" On the 7th inst. we further received the following cable message: ' Accreditions Deuxmille Salonique Cavalla offrez Ultimatum cinqmille Decembre ', the translation being as follows — ' We have credited 2,000 Salonique, Cavalla offer last price 5,000 December.

" We are sorry to say that the Greek Line was not able to book the freight for either of your orders and we will, therefore, not be able to send same off at the present time or give you further offers on the quantities for which you asked us in the above cablegrams. We, therefore, cabled you last night: ' Cannot get freight Greek Line working with other shippers to charter. Will cable as soon as possible.' However, we are very anxious to obtain your trade and are, therefore, working with several other shippers in order to obtain the freight.

" We hope that we will soon be successful and even perhaps be able to book the freight at a lower rate at which we shall let you have the benefit. We understand from the Greek Line that they are booked up until February owing to the large trade with your country at the present time.

" Please be assured that we will do everything in our power in order not to disappoint you. Our shippers believe that they will have a boat at least by the end of December."

On December 11, 1914, defendants wrote plaintiffs as follows:

" We are just in receipt of your cablegram reading: ' Offrez Cinqmille,' which translated reads ' Offer 5,000 ' and refer you to our letter and cable of yesterday's date in which we advised you that it is impossible for us at the present moment to book any freight.

" The Greek Line advised us that they have again increased their freight rates and that they will not be able to book any freight until February, 1915. We are, however, in communication with other shippers and shall not fail to advise you as soon as we have succeeded in booking freight for your orders."

On December 5, 1914, the Hanover National Bank of New York wrote Gillespie Bros. & Co., the defendants, as follows: " The Banque d'Orient, Salonica, has today requested us by cable to pay you francs 36,350 against delivery to us of invoice, insurance

policy covering both marine and war risk and complete set of ocean bills of lading covering shipment of a thousand sacks of 100 kilos farina Buttress shipment from New York prompt during December designation Salonica account Sachinis, and we presume such documents will be sent us in due course."

These are all the communications which passed between the parties during the period mentioned in the complaint.

By referring to plaintiffs' letter dated September seventh inquiring about the possible purchase of flour to the extent of 100,000 bags it will be seen that plaintiffs stated " Re Shipment, we would ask *immediate* shipment as the demand is very urgent." The reply of the defendants dated September thirtieth to plaintiffs' letter plainly indicated they could not supply plaintiffs with the flour on short notice and that they required cash in New York for all shipments as soon as the flour reached New York.

On November twenty-fifth plaintiffs cabled defendants for 1,000 bags at thirty-three francs, three per cent commission.

The defendants cabled November thirtieth stating their price to be thirty-six and thirty-five one-hundredths francs including commission " payment necessary here against documents." On December first plaintiffs cabled for " 1000 quick probability 1000 more." It is obvious from this cable that plaintiffs demanded immediate delivery, although as already stated defendants had made it quite plain in their previous letter of September thirtieth that this flour could not be shipped on a few days' notice. Furthermore, plaintiffs omitted any reference whatever to the condition imposed by defendants in that letter, viz., that payment must be made on delivery in New York. Nor was there any definite quantity specified, it was 1,000 bags quick and probably 1,000 more. No offer of 1,000 bags " quick " had been made by defendants. Defendants' next cable, dated December second, " Which bank of New York have you authorized to accept your draft," indicated clearly that defendants were insistent before proceeding further with plaintiffs in the business they must be assured of the compliance by plaintiffs with the condition already laid down, viz., that cash payment at New York must be assured. It is apparent that defendants by this cable were taking the reasonable precaution to insure payment for the flour by the plaintiffs with whom defendants were dealing for the first time before agreeing to ship to Salonica. This is confirmed by the defendants' letter of December third to plaintiffs, in which defendants, acknowledging receipt of the cable of December first from plaintiffs, say " but [we] were obliged to cable you again for information with regard to the Bank here in New York through which you intend to make payment. We regret

to say that up to the present time we have not heard from you and should be pleased to receive a reply at an early date."

There is no ground for the claim made by plaintiffs that this very cable sent by defendants on December second established a meeting of the minds. On the contrary, there is nothing in the cable or in the letter which would indicate that the defendants intended to undertake the plaintiffs' order without first being assured as to payment on the condition previously laid down in the letter of September thirtieth and referred to in the cable of November thirtieth, that is cash against the arrival of flour in New York. This cable, therefore, was not in any sense an acceptance.

Nor did the cable sent by plaintiffs and received by defendants also on December third stating " We have sold another thousand Salonique thousand Cavalla we credit Hanover Bank probability three thousand thirty six " create a contract for it is apparent the defendants' cable of November thirtieth quoting thirty-six and thirty-five one-hundredths francs as the lowest price did not mention any quantity and cannot be interpreted as an offer to sell 3,000 bags. The cablegrams from plaintiffs dated respectively November twenty-fifth and twenty-ninth contained no reference to any such quantity and there was no acceptance of the other terms previously stated by defendants to plaintiffs — that is the provision as to thirty days' notice and the provision as to prompt payment in New York on arrival of the goods, not at the time of shipment to Salonica.

This clearly appears from the letter of the Hanover National Bank to defendants dated December fifth. The authority to pay was limited by that letter to December. The thirty days' notice was not provided for, there was no authority to pay on arrival of the goods in New York as defendants insisted, but on shipment to Salonica, and the shipment was to be made to one Sachinis of whom defendants' manager testified without contradiction defendants had never heard. A shipment to plaintiffs would not have met the requirements of the bank's letter. The authority of the bank was limited to a shipment to Sachinis. Plaintiffs had never authorized defendants to make shipment to any one but themselves. Thereafter on the tenth of December defendants advised plaintiffs no freight was procurable to Salonica.

Plaintiffs' cable to defendants on December fifteenth reading, " Ship three thousand credits opened offer January February," and the reply cable of defendants dated December 19, 1914, reading, " No freight obtainable Salonique  Can probably sell seven dollars eighty cents cif  Patras January shipment," do not constitute a contract. Plaintiffs in effect asked defendants to make an offer

and defendants made no offer. They stated what *probably* could be done.

There was, therefore, no meeting of the minds of the parties up to this time. Later plaintiffs made various offers for shipments in January, February and March and an effort was made to agree upon a shipment to Patras or Piraeus instead of to Salonica, but differences arose as to which one was to pay the cost of reshipment to Salonica. These differences were never adjusted and defendants finally wrote plaintiffs that they canceled plaintiffs' orders.

The subsequent correspondence is taken up largely with letters of explanation by defendants and of expostulation by plaintiffs. This part of the correspondence cannot and does not affect the question as to whether a valid contract had been made and entered into between the parties for the sale and purchase of 3,000 bags of flour as alleged by plaintiffs. It only tends to show that both parties were desirous of doing business but were unable to come to any final, definite, workable agreement.

From the whole correspondence it is clear that there never was at any time an unconditional meeting of the minds of the parties so as to constitute a valid contract as alleged by plaintiffs. To constitute a contract an offer must be accepted in its exact terms.

In *Mahar* v. *Compton* (18 App. Div. 536) the court states the rule as follows (p. 540): " It is well settled, however, that in order to establish a legal contract through the medium of correspondence, it must be made to appear that there was not only a plain, unequivocal offer, but that the acceptance of such an offer was equally plain and free from ambiguity. In other words, there must have been an exact meeting of the minds of the contracting parties in respect to every detail of the proposed contract, and if the precise thing offered was not accepted; or if the acceptance was in any manner qualified by conditions or reservations, however slight they may have been, the universal rule seems to be that no valid contract is thereby established, but that such a modified or qualified acceptance must rather be treated as a rejection of the offer."

In *Poel* v. *Brunswick-Balke-Collender Co. of N. Y.* (216 N. Y. 310) the court clearly points out that the subsequent words or acts of parties cannot create a contract where, as in the case at bar, there has been no valid acceptance of an offer. On this point (at p. 323) the court states: " The letter of January 7th by the defendant in which it declares that Rogers acted without authority refers to the ' transaction in April last relating to 12 tons of crude rubber.' This statement obviously refers to the matters set forth in the letters of April 4th and 6th, and if these letters do not, when read

together, constitute a contract it is evident that when read in connection with the defendant's letter of January 7th they fail to express a contract.   There was no contract because, as has been shown, the plaintiffs did not accept the counter offer of the defendant expressed in its letter of April 6th.   That being so, this letter from the defendant some months later disavowing the authority of the salesman who sent the order cannot supply the omission of the plaintiffs to accept the offer which the defendant's salesman made."

On the same point the court in *Nundy* v. *Matthews* (34 Hun, 74, 79) says: " Even if both parties supposed that a binding contract existed between them, it was of no importance unless in fact such an agreement had actually been made."

The judgment appealed from should be reversed, with costs, and the complaint dismissed, with costs.

CLARKE, P. J., DOWLING, MERRELL and McAVOY, JJ., concur.

Judgment reversed, with costs, and complaint dismissed, with costs.